1  Charles L. Coleman III (SBN 65496)
   HOLLAND & KNIGHT LLP
2  50 California Street, 28th Floor
3  San Francisco, CA 94111-4624
   Telephone:    415-743-6900
4  Facsimile:    415-743-6910
   Email: charles.coleman@hklaw.com
5
6  Attorneys for Plaintiff
   THE SANKO STEAMSHIP COMPANY LIMITED
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  THE SANKO STEAMSHIP COMPANY          ) Case No. 3:17-CV-2795
13  LIMITED, a business entity organized under   )
    the laws of Japan,                   ) **VERIFIED COMPLAINT FOR**
14                          Plaintiff,   ) **MARITIME ATTACHMENT**
15               vs.                     ) **[Fed R. Civ. P. Supp. B;**
                                         ) **Admir. L.R. 2]**
16  JIT INTERNATIONAL CORPORATION        )
17  LIMITED, a business entity organized under   ) **IN ADMIRALTY**
    the laws of China,                   )
18                         Defendant.    )
19  _____ )

20          Plaintiff, The Sanko Steamship Company Limited ("Sanko", Plaintiff" or "Owner"), by

21  and through its attorneys, Holland & Knight LLP, for its verified complaint seeking an order and

22  writ of maritime attachment and garnishment over property of the defendant JIT International

23  Corporation Limited ("JIT" or "Defendant"), alleges as follows:

24                      **PRELIMINARY STATEMENT**

25          This is an application pursuant to Supplemental Rule B of the Federal Rules of Civil

26  Procedure seeking security in aid of a London maritime arbitration soon to be commenced by

27  Sanko.  Pursuant to Admiralty Rule B (Fed.R.Civ.P. Supp. B) and this Court's Local Rules of

28  Practice in Admiralty and Maritime claims (Admir.L.R.), Sanko seeks an Order from this Court

attaching Defendant JIT's funds up to an amount sufficient to satisfy Sanko's pending maritime claim against JIT.   As more fully set forth below, Sanko has reason to believe that JIT maintains funds in bank accounts in San Francisco, California.

## JURISDICTION

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and falls exclusively under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.  Specifically, as more fully set forth below, this action arises out of a charter party between Sanko, as Owner of the vessel *M/V SANKO ROYAL* and Defendant JIT, as charterer, and out of a casualty suffered in the Indian Ocean during the charter, which resulted in the General Average proceedings described below.

## INTRADISTRICT ASSIGNMENT

2.      This action is appropriate for assignment to the San Francisco District because the JIT bank accounts that Sanko seeks to attach pursuant to Admiralty Rule B are, on information and belief, located within the City and County of San Francisco, California.

## VENUE

3.      Venue in this action is proper in this District pursuant to 28 U.S.C. § 1391(b), as Defendant's property is subject to the Court's jurisdiction. This Court has *quasi in rem* jurisdiction over defendant JIT because, upon information and belief, JIT has property subject to maritime attachment within this District.

## PARTIES

4.      At all times material herein, Plaintiff The Sanko Steamship Company Limited was and is a business entity organized under the laws of Japan with its principal place of business at:

> 3-1-1, Roppongi,
>
> Minato-ku
>
> Tokyo, 106-0032, Japan

//

//

5.      At all times material herein, defendant JIT International Corporation Limited was and is a business entity organized under the laws of China with its principal place of business at:

> JIT International Corporation Limited
>
> Unit 2 (SH) 2, LG 1, Mirror Tower,
>
> 61 Mody Road, Tsim Sha Tsui, Kln,
>
> Hong Kong

## THE CHARTER PARTY AND GENERAL AVERAGE

6.      On or about October 20, 2011, Sanko, as Owner of the *M/V SANKO ROYAL* (the "Owner" and "Vessel"), and JIT, as charterer, entered into a charter party for the ocean carriage of a cargo of bagged cement, steel products, and containers (the "Cargo") from North China to West Africa via the Cape of Good Hope (the "Charter").  A copy of the Charter is annexed as **Exhibit 1** to this Complaint.

7.      The Vessel loaded the Cargo at Tianjin and experienced heavy weather on passage to Shanghai where some of the Cargo was restowed and more Cargo was loaded. Between November 26 and December 3, 2011, after calling at Singapore for bunkers, the Vessel was proceeding without issues to the port of discharge, Luanda, Angola.  On December 3, while sailing through the Indian Ocean, the crew noticed that some lashings in No. 5 hold detached.  On December 4 and 5, 2011, as a result of bad weather, the Vessel experienced rolling and pitching with some of the Cargo impacting against the Vessel's holds.  Upon inspection, it was discovered that water ballast and fuel oil were present in the No. 5 hold.

8.      On December 5, in the interest of protecting the Vessel and the Cargo from undergoing further damage, the Master ordered the Vessel to divert to Mauritius where she arrived on December 8.  Between December 9 and 12, all of the Vessel's holds were opened and inspected.   The No. 5  hold tank top was punctured, with fuel and ballast water confirmed inside.  Cracks were also identified in the No. 4 hold top tank.  To repair the damage, all containers in holds Nos.  4 and 5 were discharged.  In addition, the Cargo in holds 3 and 6 shifted and had to be similarly discharged and re-stowed.

9.     The damage to holds No. 4 and 5 was temporarily repaired and approved by the attending class surveyor.  Stowage fittings were then installed and the discharged Cargo was fully reloaded on February 3, 2012.  The Vessel then proceeded to the final destination and discharged the Cargo.

10.     As a result of the casualty, Sanko as Owner of the Vessel declared General Average and submitted its claim to General Average adjusters.

11.     General Average is an ancient maritime doctrine that relies upon certain rules to apportion loss among all interested parties when goods are sacrificed or vessels are damaged during the performance of a maritime voyage. It is based on the principle that when one partner in the venture incurs expenses for the general safety of the ship and other cargo, the loss is assessed against all participants in proportion to their respective shares in the venture.

12.     After a comprehensive review of the incident, the average adjusters issued the adjustment of claim on September 12, 2014 (the "Adjustment") in the total sum of US$1,110,843.06.  A copy of the executive summary of the Adjustment ("Adjustment of Claim") is annexed as **Exhibit 2** to this Complaint.

13. Following the release of the Adjustment, US$ 152,834.37 was recovered by the average adjusters; and US$ 650,000 was further recovered by way of settlement between the Owner and cargo interested.  Charterer JIT, however, failed to satisfy its obligations with respect to contribution due from the bunkers in the sum of US$ 2,881.54. Therefore, the total sum allowed but unrecovered under the Adjustment amounts to US$ 310,890.23.

14.     In addition, US$ 535,368.48 worth of consequential expenses were disallowed under the doctrine of General Average but were incurred as a result of the casualty and are owing to Sanko under the terms of the Charter.

//

//

//

//

**LONDON ARBITRATION**

15.     Pursuant to Clause 17 and 60 of the Charter, Plaintiff Sanko intends to initiate arbitration in London against Defendant Charterer (JIT), with English law to apply.

16.     Sanko seeks to recover from JIT, as Charterer, all costs incurred as a result of the General Average event described above, less such sums as have been recovered.

17.     Further to the above, Owner seeks to recover from JIT monies due and owing as a result of the incident as reflected in the Adjustment, including the unrecovered balance under the Adjustment, costs for re-stowage of the cargo, bunker costs, and related costs and expenses, in an amount of $ 846,258.71, plus interest.

18.     As best as can be presently estimated, Owner's total damages are calculated as follows with interest running at 6% per annum per English law, from September 12, 2014 (the date of the Adjustment, see **Exhibit 2**) until May 15, 2017 (*i.e.*, 976 days at $139.11 per day) :

| | |
|---|---|
| Principal Amount | $846,258.71 |
| Interest to May 15, 2017 | $135,772.36 |
| Estimated Cost of Arbitration | $142,000.00 |
| (recoverable under English law) | |
| **Total Claim:** | **$1,124,031.07** |

**REQUEST FOR MARITIME ATTACHMENT AND GARNISHMENT**

19.     The Charter is a maritime contract and the dispute concerns a General Average event during a sea voyage. Accordingly, Plaintiff Sanko is entitled to the issuance of a Rule B order of attachment directing seizure of the Defendant JIT's property in the District.

20.     JIT is not found within the Northern District of California. In order for a defendant to be "found," the defendant must be "found" within the district in terms of both jurisdiction *and* service of process. JIT is not registered to do business in California and has no designated agent for service of process in California.

21.     Although JIT is not found in the Northern District of California, upon information and belief, it does have bank accounts in U.S. Dollars located within the District. Hence, the Defendant has, or will have during the pendency of this proceeding, assets, goods,

1    chattels, credits, letters of credit, bills of lading, debts, effects and monies, funds, credits,
2    accounts, letters of credit, brokerage accounts, freights, sub-freights, charter hire, sub-charter
3    hire, or other tangible or intangible which belong to it, are claimed by it, or are being held for
4    it or on its behalf, including but not limited to such accounts at the Bank of America. Plaintiff
5    learned of accounts at Bank of America in its asset investigation in anticipation of London
6    arbitration.

7        22.    **Rule 44.1 Statement of Intent to Rely on Foreign Law.**   Whereas the
8    Agreement is governed by English law, The Sanko Steamship Company Limited intends to
9    rely on foreign law, specifically the laws of England.

10       **WHEREFORE**, Plaintiff The Sanko Steamship Company Limited prays:

11       1.    That a summons with process of attachment and garnishment issue against the
12   Defendant JIT International Corporation Limited, in the amount of **$1,124,031.07** (including
13   estimated interest and arbitration fees), and if JIT International Corporation Limited cannot be
14   found, then that its goods, chattels, credits, letters of credit, bills of lading, debts, effects
15   and monies, funds, credits, accounts, letters of credit, brokerage accounts, freights, sub-
16   freights, charter hire, sub-charter hire, or other tangible or intangible property which belongs
17   to it, is claimed by it, or is being held for it or on its behalf, within the district may be
18   attached in an amount sufficient to answer Plaintiff's claims.

19       2.    That Defendant JIT International Corporation Limited, and any other person
20   claiming an interest therein may be cited to appear and answer the matters aforesaid;

21       3.    That this Court retain jurisdiction over this matter through the entry of any
22   award associated with any of the claims currently pending, or which may be initiated in the
23   future, including any appeals thereof; and

24   //
25   //
26   //
27   //
28   //

1        4.    That this Court grant The Sanko Steamship Company Limited such other relief

2    as may be just and proper.

3    Dated: San Francisco, California

4    May 15, 2017

5                             HOLLAND & KNIGHT LLP

7                   By:    _____

8                             Charles L. Coleman III (SBN 65496)
                         HOLLAND & KNIGHT LLP

9                             50 California Street, 28th Floor
                         San Francisco, California  94111

10                             Telephone: (415) 743-6900
                         Facsimile: (415) 743-6910

11                             Email: charles.coleman@hklaw.com

12                             Attorneys for Plaintiff

13                             THE SANKO STEAMSHIP COMPANY
                         LIMITED

15                             Of Counsel:

16                             Christopher R. Nolan

17                             Clayton Vignocchi
                         HOLLAND & KNIGHT LLP

18                             31 West 52nd Street
                         New York, New York 10019

19                             Telephone: (212) 513-3307

20                             Facsimile:  (212) 385-9010

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### <u>VERIFICATION</u>

STATE OF CALIFORNIA          )
                             ) ss.:
CITY AND COUNTY OF SAN FRANCISCO )

Charles L. Coleman III, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for The Sanko Steamship Company Limited ("Plaintiff" or "Sanko") in this matter. I am a member of the bar of this Court. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge, information and belief. I have reviewed documentation provided to me by Plaintiff's representatives (subrogated insurers and London counsel) and have corresponded with those representatives regarding this matter. I am authorized by Plaintiff Sanko via its subrogated insurers and London counsel to make this Verification on its behalf, and the reason for my making this Verification instead of an officer, director or other authorized corporate representative of Plaintiff Sanko is that I have been informed by the aforementioned insurers and representatives that there are none within this District.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

_____
CHARLES L. COLEMAN III

VERIFIED COMPLAINT FOR ATTACHMENT          8          CASE NO. 3:17-CV-2795

# Exhibit 1



Copyright © 1981 and Published by The Association of Ship Brokers & Agents (U.S.A.), Inc. (ASBA), New York. This derivative work may not be copied without the permission of the copyright owners. Code Name: ASBATIME

**SECOND ORIGINAL**



# TIME CHARTER
### New York Produce Exchange Form

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946; June 12th, 1981

| | | |
|---|---|---|
| | THIS CHARTER PARTY, made and concluded in *Beijing* ........................................ | 1 |
| | ........................*20th*.............. day of *October, 2011*.......... 19........ | 2 |
| **Owners** | between *The Sanko Steamship Co., Ltd., Tokyo* as....................................... | 3 |
| | ................................................................................... Owners of | 4 |
| | the good ........................................ Steamship/Motorship *Sanko Royal*.................. | 5 |
| ~~**Description**~~ | ~~of ................................................-of-.............................tons gross register, and~~ | 6 |
| ~~**of**~~ | ~~...............................................tons net register, having engines of .........................~~ | 7 |
| ~~**Vessel**~~ | ~~horsepower and with hull, machinery and equipment in a throughly efficient~~ | 8 |
| | ~~state, and classed ...............................................................of about~~ | 9 |
| | ~~..................................................cubic feet grain/bale capacity .....................~~ | 10 |
| | ~~................................................................................, and about~~ | 11 |
| | ~~............................................long/metric tons deadweight capacity (cargo and~~ | 12 |
| | ~~bunkers, including fresh water and stores not exceeding..................................~~ | 13 |
| | ~~long/metric tons) on a salt water draft of .................................................on summer~~ | 14 |
| | ~~freeboard, inclusive of permanent bunkers, which are of the capacity of about~~ | 15 |
| | ~~...............................................................................long/metric tons of~~ | 16 |
| | ~~.......................................fuel oil and .......................~~ | 17 |
| | ~~long/metric tons of.........................................................., and~~ | 18 |
| | ~~capable of steaming, fully laden, under good weather conditions about~~ | 19 |
| | ~~.................................knots on a consumption of about .......................~~ | 20 |
| | ~~long/metric tons of .........~~*(Description see Clause 28)* | 21 |
| | | 22 |
| | now *trading* ................................................................................ | 23 |
| | .............................................................................. and | 24 |
| **Charterers** | *JIT International Corporation Limited*.................................................... | 25 |
| | ............................................... Charterers of the City of ................................... | 26 |
| **Duration** | The Owners agree to let and the Charterers agree to hire the vessel from the | 27 |
| | time of delivery for ~~about~~ *one time charter trip via safe berth(s), safe port(s), safe* | 28 |
| | *anchorage(s) always afloat always within Institute Warranty Limits, always ice free with* | 29 |
| | *lawful/harmless bagged cement, steel products, containers from North China to West* | 30 |
| | *Africa via Cape of Good Hope, duration about 65 days without guarantee*   within below | 30 |
| | mentioned trading limits. | 30 |
| **Sublet** | Charterers shall have liberty to sublet the vessel for all or any part of the | 31 |
| | time covered by this Charter, but Charterers shall remain responsible for the | 32 |
| | fulfillment of this Charter. | 33 |
| **Delivery** | Vessel shall be placed at the disposal of the Charterers *on dropping last outward* | 34 |
| | *sea pilot Qingdao any time day or night Sunday and holiday included* ............................... | 35 |
| | | 36 |
| | | 37 |
| | ~~in such dock or at such berth or place (where she may safely lie, always afloat,~~ | 38 |
| | ~~at all times of tide, except as otherwise provided in Clause 6) as the Charterers~~ | 39 |
| | ~~may direct. If such dock, berth or place be not available, time shall count as~~ | 40 |
| | ~~provided in Clause 5.~~ Vessel on her *arrival first loading port* ~~delivery~~ shall be ~~ready to~~ | 41 |
| | ~~receive cargo~~ with | 41 |
| | clean-swept holds and tight, staunch, strong and in every way fitted for ordi- | 42 |
| | nary cargo service, having water ballast and with sufficient power to operate all | 43 |
| | cargo-handling gear simultaneously (and with full complement of officers and | 44 |
| | crew for a vessel of her tonnage), to be employed in carrying lawful merchan- | 45 |
| **Dangerous** | dise ~~excluding any goods of a dangerous, injurious, flammable or corrosive~~ | 46 |
| **Cargo** | ~~nature unless carried in accordance with the requirements or recom-~~ | 47 |
| | ~~mendations of the proper authorities of the state of the vessel's registry and of~~ | 48 |
| | ~~the states of ports of shipment and discharge and of any intermediate states or~~ | 49 |
| | ~~ports through whose waters the vessel must pass. Without prejudice to the~~ | 50 |
| **Cargo** | ~~generality of the foregoing, in addition the following are specifically excluded:~~ | 51 |
| **Exclusions** | ~~livestock of any description, arms, ammunition, explosives~~ *See Clause 29*.................... | 52 |
| | ................................................................................... | 53 |

SHIPBROKERS
MAERSK BROKER
ASIA LIMITED
HONG KONG

.........................................................................................
.........................................................................................
.........................................................................................

**Trading Limits**   The vessel shall be employed in such lawful trades between safe ports and   58
places within *See Clause 29*............................................................... 59
.................................................................. excluding .................... 60
......................................................................................... 61
......................................................................................... 62
as the Charterers or their agents shall direct, on the following conditions:   63

**Owners to**   1.   The Owners shall provide and pay for the insurance of the vessel and   64
for all provisions, *drinking water, garbage removal, immigration,* cabin, deck,   65
engine-room and other necessary stores, in-   65

**Provide**   cluding *lubricating oil, fresh water,* boiler water; shall pay for wages, consular shipping   66
and discharging   66
fees of the crew and charges for port services pertaining to the crew; shall   67
maintain vessel's class and keep her in a thoroughly efficient state in hull,   68
machinery and equipment for and during the service.   69

**Charterers to**   2.   The Charterers, while the vessel is on hire, shall provide and pay for all   70
the fuel except as otherwise agreed, port charges, pilotages, towages, agen-   71

**Provide**   cies, *for clearance cargo purposes and other Charterers' business only, boatage on*   72
*Charterers' business,* commissions, consular charges (except those pertaining to   72
individual   72
crew members or flag of the vessel), and all other usual expenses except those   73
stated in Clause 1, but when the vessel puts into a port for causes for which   74
vessel is responsible, then all such charges incurred shall be paid by the   75
Owners. ~~Fumigations ordered because of illness of the crew shall be for~~   76
~~Owners' account.~~ Fumigations ordered because of cargoes carried or ports   77
visited while vessel is employed under this Charter shall be for Charterers'   78
account. ~~All other fumigations shall be for Charterers' account after vessel has~~   79
~~been on charter for a continuous period of six months or more.~~ *Owners to keep on*   80
*board a valid deratization certificate throughout the Charter Party period.*   80
Charterers shall provide necessary dunnage and shifting boards, also   81
any extra fittings requisite for a special trade or unusual cargo, but Owners   82
shall allow them the use of any dunnage and shifting boards already aboard   83
vessel.   84

**Bunkers on Delivery and Redelivery**   3.   The Charterers on delivery, and the Owners on redelivery, shall take   85
over and pay for all fuel and diesel oil remaining on board the vessel as   86
hereunder. The vessel shall be delivered ~~with:~~ ......................*Bunkers as per Clause 73*   87
~~long/metric* tons of fuel oil at the price of~~ ................................................~~per ton;~~   88
........................................................~~tons of diesel oil at the price of~~ ...........................   89
~~per ton. The vessel shall be redelivered with:~~ .................................................   90
~~tons of fuel oil at the price of~~ ........................................................~~per ton;~~ .....................   91
................................................~~tons of diesel oil at the price of~~ .............................~~per ton~~   92
......................................................................................... 93
......................................................................................... 94
~~(*Same tons apply throughout this clause)~~   95

**Rate of Hire**   4.   The Charterers shall pay for the use and hire of the said vessel at the   96
rate of *USD10,800 daily or pro rata including overtime payable semi-monthly in advance.*   97
*In case excess 70 days, hire rate thereafter to be USD15,000 daily, or pro rata including*   97
*overtime. Should the vessel be placed off-hire for any legitimate reason up to and*   98
*including the 70th day, such off-hire time will be added to the 70 days and paid at*   98
*USD10,800 daily or pro rata* United States Currency   98
~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~   99
~~stores, on~~ ...................................................~~summer freeboard, per calendar month,~~   100
commencing on and from the *time* day of her delivery, as aforesaid, and at and after   101
the same rate for any part of a month; hire shall continue until the hour of the   102

**Redelivery**   *time* day of her *based on GMT* redelivery in like good order and condition, ordinary   103
wear and tear   103

**Areas and Notices**   excepted, to the Owners (unless vessel lost) at *on dropping last outward sea pilot one*   104
*safe port Capetown/Dakar range port in Charterers option, but always as per trading*   105
*exclusion, intention Douala, Cameroon any time day or night Sunday and holiday*   106
*included* ............................................................ unless otherwise mutually agreed.   107
Charterers shall give Owners not less than *25/20/15/12/10/7/5/3/2/1* days notice   108
of vessel's expected date of redelivery ~~and probable port~~ *Charterers to declare firm*   109

*redelivery port upon sailing from last loading port.* ...................................

**Hire**

    5.  Payment of hire shall be made *by telegraphic transfer on or before due date* so
as to be received by Owners or their

**Payment
and
Commencement**

designated payee in ~~New York, i.e.~~ *to Owners designated bank account.*
*CITIBANK, N.A. NEW YORK 399 PARK AVENUE, N.Y.  SWIFT: CITIUS33 FOR A/C*
*OF THE SAKO STEAMSHIP CO., LTD.  A/C NO. 4068-6369* ........................................
........................................................................... in United States Currency, in funds
available to the Owners on the due date, semi-monthly in advance, and for the
last half month or part of same the approximate amount of hire, and should
same not cover the actual time, hire shall be paid for the balance day by day as
it becomes due, if so required by Owners. Failing the punctual and regular
payment of the hire, or on any breach of this Charter, the Owners shall be at
liberty to withdraw the vessel from the service of the Charterers without pre-
judice to any claims they (the Owners) may otherwise have on the Charterers.
*Where there is failure to make punctual and regular payment of hire, the Charterers
shall be given by the Owners two (2) banking days written notice to rectify the failure,
and when so rectified within those two (2) days following Owners' notice, the payment
shall stand as regular and punctual and the Owners will not withdraw the vessel.*
~~Time shall count from 7 A.M. on the working day following that on
which written notice of readiness has been given to Charterers or their agents
before 4 P.M., but if required by Charterers, they shall have the privilege of
using vessel at once, in which case the vessel will be on hire from the com-
mencement of work.~~

**Cash
Advances**

    Cash for vessel's ordinary disbursements at any port may be advanced,
as required by the Captain, by the Charterers or their agents, subject to 2 1/2
percent commission and such advances shall be deducted from the hire. The
Charterers, however, shall in no way be responsible for the application of such
advances.

**Berths**

    6.  Vessel shall be loaded and discharged in any dock or at any berth or
place that Charterers or their agents may direct, provided the vessel can safely
lie always afloat at any time of tide, ~~except at such places where it is customary
for similar size vessels to safely lie aground.~~

**Spaces
Available**

    7.  The whole reach of the vessel's holds, decks, and usual places of
loading (not more than she can reasonably and safely stow and carry), also
accommodations for supercargo, if carried, shall be at the Charterers' dis-
posal, reserving only proper and sufficient space for ship's officers, crew,
tackle, apparel, furniture, provisions, stores and fuel.

**Prosecution
of
Voyages**

    8.  The Captain shall prosecute his voyages with due despatch, and shall
render all customary assistance with ship's crew and boats. The Captain
(although appointed by the Owners) shall be under the orders and directions of
the Charterers as regards employment and agency; and Charterers are to
perform all cargo handling at their expense under the supervision of the
Captain, who is to sign the bills of lading for cargo as presented in conformity
with mate's or tally clerk's receipts. However, at Charterers' option, the Chart-
erers or their agents may sign bills of lading on behalf of the Captain always in

**Bills
of
Lading**

conformity with mate's or tally clerk's receipts. ~~All bills of lading shall be
without prejudice to this Charter and the Charterers shall indemnify the Own-
ers against all consequences or liabilities which may arise from any inconsis-
tency between this Charter and any bills of lading or waybills signed by the
Charterers or their agents or by the Captain at their request.~~

**Conduct of
Captain**

    9.  If the Charterers shall have reason to be dissatisfied with the conduct of
the Captain or officers *or any of the crew members*, the Owners shall, on receiving
particulars or
complaint, investigate the same, and, if necessary, make a change in the
appointments. *But this provision does not affect Charterers' right to advance any claim or
require arbitration under Clause 17 on dispute regarding the conduct of the Master in
prosecution of the voyage and carrying out the orders and the direction of the Charterers.*

**Supercargo
and
Meals**

    10. The Charterers are entitled to appoint a supercargo, who shall accom-
pany the vessel and see that voyages are prosecuted with due despatch. He is
to be furnished with free accommodation and same fare as provided for
Captain's table, Charterers paying at the rate of *US$10.00* ............................ per day.
~~Owners shall victual pilots and customs officers, and also, when authorized by
Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,
Charterers paying at the rate of~~ ......................................per meal for all such victual-
~~ling.~~

| | |
|---|---|
| | 110 |
| | 111 |
| | 112 |
| | 113 |
| | 114 |
| | 115 |
| | 116 |
| | 117 |
| | 118 |
| | 119 |
| | 120 |
| | 121 |
| | 122 |
| | 122 |
| | 122 |
| | 122 |
| | 122 |
| | 123 |
| | 124 |
| | 125 |
| | 126 |
| | 127 |
| | 128 |
| | 129 |
| | 130 |
| | 131 |
| | 132 |
| | 133 |
| | 134 |
| | 135 |
| | 136 |
| | 137 |
| | 138 |
| | 139 |
| | 140 |
| | 141 |
| | 142 |
| | 143 |
| | 144 |
| | 145 |
| | 146 |
| | 147 |
| | 148 |
| | 149 |
| | 150 |
| | 151 |
| | 152 |
| | 153 |
| | 154 |
| | 155 |
| | 156 |
| | 156 |
| | 157 |
| | 158 |
| | 158 |
| | 158 |
| | 159 |
| | 160 |
| | 161 |
| | 162 |
| | 163 |
| | 164 |
| | 165 |
| | 166 |

**Sailing Orders and Logs**

11. The Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep full and correct deck and engine logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, showing the course of the vessel, distance run and the consumption of fuel.

**Ventilation**

12. The Captain shall use diligence in caring for the ventilation of the cargo.

**Continuation**

13. The Charterers shall have the option of continuing this Charter for a further period of.................................................................................................

.................................................................................................

**Laydays/ Cancelling**

14. If required by Charterers, time shall not commence before *00:01 hour (local time) 21st October 2011* ................. and should vessel not have given written notice of readiness on or before *23:59 hours (local time) 28th October 2011* but not later than 4 P.M. Charterers or their agents shall have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

**Off**

15. *See Clause 45.* In the event of the loss of time from deficiency and/or default of officers

**Hire**

or crew or deficiency of stores, fire, breakdown of, or damages to, hull, machinery or equipment, grounding, detention by average accidents to ship or cargo unless resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the vessel, the payment of hire and overtime, if any, shall cease for the time thereby lost. Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident to the cargo, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All fuel used by the vessel while off hire shall be for Owners' account. In the event of the vessel being driven into port or to anchorage through stress of weather, trading to shallow harbors or to rivers or ports with bars, any detention of the vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

**Total Loss**

16. Should the vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once.

**Exceptions**

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers and steam navigation, and errors of navigation throughout this Charter, always mutually excepted.

**Liberties**

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

**Arbitration**

17. Should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *arbitration in London, English Law to apply, in accordance with the Arbitration Act 1990 and any subsequent amendments. The award of the arbitration* three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision, or that of any two of them, shall be final and for the purpose of enforcing any award this agreement may be made a rule of the Court. The arbitrators shall be commercial men conversant with shipping matters.

**Liens**

18. The Owners shall have a lien upon all cargoes and all sub-freights, *sub-hires* for

any amounts due under this Charter, including general average contributions, and the Charterers shall have a lien on the ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the vessel.

**Salvage**

19. All derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and crew's propor-

tion.

**General Average**
General average shall be adjusted, according to York-Antwerp Rules *1994 as any amendments thereto in London. Hire not to be contributed to General Average.* 1974, at such port or place in the United States as may be selected by the Owners and as to matters not provided for by these Rules, according to the laws and usage at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the Owners, must be furnished before delivery of the goods. Such cash deposit as the Owners or their agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Owners before delivery. Such deposit shall, at the option of the Owners, be payable in United States money and remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the general average and refunds or credit balances, if any, shall be paid in United States money.

**York-Antwerp Rules**
Charterers shall procure that all bills of lading issued during the currency of the Charter will contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules *1994 or any amendments thereto* 1974 and will include the

"New Jason Clause" as per Clause 23.

**Drydocking**
20. The vessel was last drydocked. ............................................................................. The Owners shall have the option to place the vessel in drydock during the currency of this Charter at a convenient time and place, to be mutually agreed upon between Owners and Charterers, for bottom cleaning and painting and/or repair as required by class or dictated by circumstances. Payment of hire shall be suspended upon deviation from Charterers' service until vessel is again placed at Charterers' disposal at a point not less favorable to Charterers than when the hire was suspended. ..........................................................................

..........................................................................................................................................

..........................................................................................................................................

**Cargo Gear**
21. Owners shall maintain the cargo-handling gear of the ship which is as follows: .............................................................................................................................

..........................................................................................................................................

..........................................................................................................................................,

providing gear (for all derricks or cranes) capable of lifting capacity as described. Owners shall also provide on the vessel for night work lights as on board, but all additional lights over those on board shall be at Charterers' expense. The Charterers shall have the use of any gear on board the vessel. If required by Charterers, the vessel shall work night and day and all cargo-handling gear shall be at Charterers' disposal during loading and discharging.

**Stevedore Stand-by**
In the event of disabled cargo-handling gear, or insufficient power to operate the same, *hire to be reduced pro-rata, for the period of such insufficiency in relation to the number of hatche(es) available unless such disablement or in sufficiency of power is caused by the Charterers stevedore,* the vessel is to be considered to be *pro-rata* off hire to the extent that time is

actually lost to the Charterers and Owners to pay stevedore stand-by charges occasioned thereby. If required by the Charterers, the Owners are to bear the cost of hiring shore gear in lieu thereof, *in which case the vessel shall remain on hire.*

**Crew Overtime**
22. In lieu of any overtime payments to officers and crew for work ordered by Charterers or their agents, Charterers shall pay Owners $ ..................................... per month or pro rata.

**Clauses Paramount**
23. *See Clause 54.* The following clause is to be included in all bills of lading issued hereunder:

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein con-

~~tained shall be deemed a surrender by the carrier of any of its rights or~~
~~immunities or an increase of any of its responsibilities or liabilities under said~~
~~applicable Act. If any term of this bill of lading be repugnant to said applicable~~
~~Act to any extent, such term shall be void to that extent, but no further.~~

This Charter is subject to the following clauses all of which are to be
included in all bills of lading issued hereunder:

**New Both-to-Blame Collision Clause**

If the ship comes into collision with another ship as a result of the
negligence of the other ship and any act, neglect or default of the master,
mariner, pilot or the servants of the carrier in the navigation or in the manage-
ment of the ship, the owners of the goods carried hereunder will indemnify the
carrier against all loss or liability to the other or non-carrying ship or her
owners insofar as such loss or liability represents loss of, or damage to, or any
claim whatsoever of the owners of said goods, paid or payable by the other or
non-carrying ship or her owners to the owners of said goods and set off,
recouped or recovered by the other or non-carrying ship or her owners as part
of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators
or those in charge of any ships or objects other than, or in addition to, the
colliding ships or objects are at fault in respect to a collision or contact.

**New Jason Clause**

In the event of accident, danger, damage or disaster before or after
commencement of the voyage resulting from any cause whatsoever, whether
due to negligence or not, for which, or for the consequences of which, the
carrier is not responsible, by statute, contract, or otherwise, the goods, ship-
pers, consignees, or owners of the goods shall contribute with the carrier in
general average to the payment of any sacrifices, losses, or expenses of a
general average nature that may be made or incurred, and shall pay salvage
and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be
paid for as fully as if salving ship or ships belonged to strangers. Such deposit
as the carrier or his agents may deem sufficient to cover the estimated con-
tribution of the goods and any salvage and special charges thereon shall, if
required, be made by the goods, shippers, consignees or owners of the goods
to the carrier before delivery.

**War Clauses**

~~(a) No contraband of war shall be shipped. Vessel shall not be re-~~
~~quired, without the consent of Owners, which shall not be unreasonably~~
~~withheld, to enter any port or zone which is involved in a state of war, warlike~~
~~operations, or hostilities, civil strife, insurrection or piracy whether there be a~~
~~declaration of war or not, where vessel, cargo or crew might reasonably be~~
~~expected to be subject to capture, seizure or arrest, or to a hostile act by a~~
~~belligerent power (the term "power" meaning any de jure or de facto authority~~
~~or any purported governmental organization maintaining naval, military or air~~
~~forces).~~

~~(b) If such consent is given by Owners, Charterers will pay the provable~~
~~additional cost of insuring vessel against hull war risks in an amount equal to~~
~~the value under her ordinary hull policy but not exceeding a valuation of~~
~~.................................................In addition, Owners may purchase and Charterers~~
~~will pay for war risk insurance on ancillary risks such as loss of hire, freight~~
~~disbursements, total loss, blocking and trapping, etc. If such insurance is not~~
~~obtainable commercially or through a government program, vessel shall not~~
~~be required to enter or remain at any such port or zone.~~

~~(c) In the event of the existence of the conditions described in (a)~~
~~subsequent to the date of this Charter, or while vessel is on hire under this~~
~~Charter, Charterers shall, in respect of voyages to any such port or zone~~
~~assume the provable additional cost of wages and insurance properly incurred~~
~~in connection with master, officers and crew as a consequence of such war,~~
~~warlike operations or hostilities.~~

**Ice**

24. The vessel shall not be required to enter or remain in any icebound port
or area, nor any port or area where lights or lightships have been or are about
to be withdrawn by reason of ice, nor where there is risk that in the ordinary
course of things the vessel will not be able on account of ice to safely enter and
remain in the port or area or to get out after having completed loading or
discharging. *Vessel not to force nor to follow icebreakers.*

**Navigation**

25. Nothing herein stated is to be construed as a demise of the vessel to the
Time Charterers. The Owners shall remain responsible for the navigation of the
vessel, acts of pilots and tug boats, insurance, crew, and all other similar

286<br>
287<br>
288<br>
289<br>
290<br>
291<br>
292<br>
293<br>
294<br>
295<br>
296<br>
297<br>
298<br>
299<br>
300<br>
301<br>
302<br>
303<br>
304<br>
305<br>
306<br>
307<br>
308<br>
309<br>
310<br>
311<br>
312<br>
313<br>
314<br>
315<br>
316<br>
317<br>
318<br>
319<br>
320<br>
321<br>
322<br>
323<br>
324<br>
325<br>
326<br>
327<br>
328<br>
329<br>
330<br>
331<br>
332<br>
333<br>
334<br>
335<br>
336<br>
337<br>
338<br>
339<br>
340<br>
341<br>
342<br>
343<br>
344<br>
345<br>
346<br>
347<br>
348<br>
349<br>
350<br>
351

**Commissions**     matters, same as when trading for their own account.

    26. A commission of *1.25* ................................... percent is payable by the vessel
and Owners to *Maersk Broker Asia Limited* .................................................

on hire earned and paid under this Charter, and also upon any continuation or | 356
extension of this Charter. | 357

**Address**     27. An address commission of *3.75* ........................................ percent | 358
is payable to *Charterers* ........................................................ | 359
  | 360

on hire earned and paid under this Charter. | 361

**Rider**     Rider Clauses *28-96* ........................................................ as at- | 362
tached hereto are incorporated in this Charter. | 363
  | 363
  | 363
  | 363
  | 363

*The Owners*                               *The Charterers*

THE SANKO STEAMSHIP CO.,LTD.

*For and on behalf of*
JIT INTERNATIONAL CORPORATION LIMITED
吉運國際有限公司

K.KOGA
GENERAL MANAGER
BOXSHAPE CARRIERS DEPT.

*Authorized Signature(s)*

Name : Xu Dapeng
Title : Director
Dept : Chartering Department



## Clause 28 – Description Clause

M/V SANKO ROYAL
Panama/1995/NK
Open-hatch box-shaped hold bulker (Excluding NO.1/NO.8)
- Max 2.40M over hand (Hatch way/fore and aft only)
  is existing through NO.2-NO.7 HOLD.
- small slant (hopper) is existing in NO.7 Hold.
(after part/ both side).

DWT 42,529MT ON 11.535M SSW DRAFT
GRT 25,676 / NRT 13,991
LOA 184,93M / BEAM 30.50M / DEPTH 16.20M
4 set x 30T jib crane (4 gears serving all hatches but only 4 hatches simultaneously and each crane set serving only immediately adjacent hatches
8 holds / 8 hatches
Grain/bale capacity 1,802,319CFT/1,759,341 CFT

| Hatch size | | |
|---|---|---|
| | NO.1 | .80M X 12.96M |
| | NO.2/6/7 | 4.40M x 25.92M |
| | NO.3 | 3.60M x 25.92M |
| | NO.4/5 | 2.80M x 25.92M |
| | NO.8 | .80M x 16.20M |

- Hatch type
  NO.1/8: folding type
  NO.2/3, 4/5, 6/7: piggy back type

- ALL DETAILS 'ABOUT'.

Speed/consumption: (all figure 'about')

(At sea)
(Under good weather conditions, no adverse affect of current and sea swell up  to and including Beaufort Scale Force 4/Dougalas Sea State 3)
Ballast – about 14.3 knots on about 29.5 MT IFO (380CST-RMG380) + about 0.1MT MDO (DMB)
Laden – about 13.7 knots on about 30.0MT IFO (380CST-RMG380) + about 0.1MT MDO (DMB)

(At port)
Idling - about 3.0MT IFO (380CST-RMG380) + about 0.1MT MDO (DMB)
Gear working - about 3.5MT IFO (380CST-RMG380) + about 0.1MT MDO (DMB)

Charterters guarantee to supply bunker with quality with the requirements of 380CST-RMG380 for IFO and DMB for MDO under ISO 8217-E (2005)

The vessel has liberty to burn gas oil/diesel oil for main engine when maneuvering in shallow/narrow/restricted water, canal, rivers or in and out of port.



### Clause 29 – Cargo/Trading Exclusions

**Cargo Exclusion:**

Vessel to be employed in carrying lawful cargoes/merchandize, always excluding all IMO/IMDG cargoes classified under categories 1-9, ammonia, ammonium nitrate, ammonium sulfate, ammunitions, ammonium nitrate based fertilizer, arms, bone meal, bulk borax, calcium carbide, calcium hydrochloride, cement, cement clinker, charcoal, containers, ferro silicon, chrome, chromite, ferrochrome, chrome ore, chrome bearing ores/alloys, fluorspar, nickel ores/alloys, gypsum board, plaster board, hazardous cargoes, injurous/inflammable or dangerous goods, macoya expellers, macoya pellets, metal borings and cuttings, naphtha and its products, nuclear fuel materials and wastes, petroleum, petroleum products, pond coal, nuclear and radioactive materials and wastes, turpentine, war materials, livestocks, nuclear materials, tar in bulk, pitch in bulk (including pencil pitch), asphalt. silica manganese, any kind of seed cake, sunflower seeds expellers, oilcakes, pyrites, fishmeal, hides, creosoted goods, calcium carbide, pond solids, explosives (black powder, blasting caps, detonators, loaded bombs, dynamite and TNT), acids, motor spirit, wet hides, turnings, asbestos, bitumen, sponge iron, direct reduced iron, direct reduced iron ore pellets, hot moulded briquettes, hot briquetted iron, cottons, sodium sulphate, sulphur, salt, any kind of deck cargo, motor block, copra, quebracho, log, mahogany logs, and any kind of arms and ammunitions, bitumen, salt petre, Chilean nitrate, quicklime, hydrochloride (oxychloride), batteries, dichloropenol and other phenol derivatives, castor beans/meal and seed, glutten feed with high oil content, industrial waste, nigerseed, pebbles, any kind of scrap, alumina silicon powder, calcium oxycholoride, caustic soda, iron briquettes, iron oxide, iron sponge, iron swarfe, mobile bones and prefabs, all nitrates querbracho extracts, silco-manganese, acid explosives, Indian sponge, all sulphates, resin, nitrate, oilseeds and its products, brown coal, Indian coal, petcoke, lime, DDG, DDGS and any other cargoes (except coal) listed in Group B Of BC Code.

Always excluding bulk cargoes listed in the IMO/International Maritime Solid Bulk Cargoes Code which can not be certified by Charterers/shippers as harmless and/or having a history of shipment without problems. Charterers undertake to load vessel in accordance with IMO/International Maritime Solid Bulk Cargoes Code also in accordance with any local regulations.

All cargoes (especially concentrate and coal) to be in accordance with IMO Regulations and all cargoes (especially concentrate and coal) to be loaded, stowed, carried, and discharged strictly in accordance with IMO/International Maritime Solid Bulk Cargoes Code and local regulations.

Notwithstanding the above:

- Containers - allowed on following basis:
a) All cargoes listed under "cargo exclusion", even if loaded in containers, are still not allowed to be loaded
b) Charterers have the option to load containers on deck (but space for containers are available on port side/starboard side of h1/h8 only and of course always subject stowage and sufficient securing, sufficient lashing. containers are not allowed to load on all of hatch covers.) but, always in accordance with 'on deck clause' (as below):

c) Charterers are obliged to inform Owners of the details of the contents of containers during office hours in Owners Tokyo office before containers have been loaded on board.

d) The vessel does not have any equipment/materials on board for containers fitting, which is to be for Charterers account if required.

e) For loading container, max 2 tiers is allowed, but charterers to assume not to obstruct ship's visibility.

f) Charterers arrange enough dunnaging/securing/lashing upto Owners/Masters satisfaction at Charterers risk/time/expense/responsibility.

- On deck cargo - allowed on following basis:

a) In case loading on deck cargo (including hatch cover, but containers are not allowed to load on all of hatch covers.), these cargoes should be always approved by Owner in advance. Owners approval must be executed within 6 working hours after Charterers notice subject Owners obtains this information within office hours (09:00-17:00) in Tokyo time.

b) Charterers have the option to load cargoes on deck (including hatch cover, but containers are not allowed to load on all of hatch covers) in charterers' time/costs/responsibility, but always in accordance with vessel's usual marine practice and safety regulations and the vessel's trim, permissible, strength and stability and seaworthiness always master's/owner's satisfaction.

Charterers to well in advance advise Owners of lashing/securing/dunnaging plan and cargo details including dimension.

Cargoes to be loaded/lashed/secured/carried/discharged/dunnaged at Charterers' risk, responsibility and expenses and all bills of lading should be made out accordingly and marked "shipped on deck at Charterers', Shippers' and receivers' risk, expenses and responsibility, without liability on the part of the vessel or her Owners for any loss, damage, expense or delay howsoever caused". In the event of deck cargo being carried, the Owners are to be and hereby indemnified by the Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the vessel as a result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.

- Subject to Master's approval, which not to be unreasonably withheld, Charterers have the option to weld padeyes and/or other lashing/securing devices/points with master's satisfaction at Charterers time/expenses/risk. Charterers must remove padeyes and/or other lashing/securing devices/points/dunnage with master's satisfaction before redelivery at Charterers time/expenses/risk. But location where padeyes and/or other lashing/securing devices/points to be welded is always subject to masters approval and should be always avoided welding on fuel tank and be welded on the beam in hold with strength without damage to plate. Padeyes and/or other lashing/securing devices/points can not be welded on any part of hatch covers.

- On deck cargo be loaded by vessel's cranes subject to cranes ability or loaded by shore crane.

- Enough dunnaging/securing/lashing to be done upto Master's/Owner's satisfaction.

- Lawfull general cargo may be loaded on the top of bagged cement in hold provided Charterers provide sufficient dunnages over the bagged cement to protect the bagged cement, and the cargo loaded on top is of such weight and dimensions spread so as not to damage the bagged cement. Charterers arrange enough dunnaging/securing/lashing upto Owners/ Masters satisfaction and Charterers to well in advance advise Owners of such lashing/securing/dunnaging plan and cargo details including dimension in sufficient time prior to loading. Charterers are to be responsible for any and all cargo damage and cargo claims caused by loading cargo on top of the bagged cement and howsoever caused in the holds and Charterers are to indemnify owners accordingly.

### TRADING EXCLUSION:

World wide trading always via safe port(s), safe berth(s) and safe anchorage(s) and places always afloat always within Institute Warranty Limits, but excluding Algeria, Iran, Iraq, Yemen, Ivory Coast, Syria, Congo, Lebanon, Albania, Benin, Cuba, Israel, Israel Controlled, Turkish Occupied Cyprus, Liberia, Cambodia, North Korea, Libya, Russian Pacific Port(s), Siberian Russian Port(s), Lagos, Ports that were previously in Yugoslavia, Ethiopia, Zaire, Haiti, Sudan, Somalia, Serbia and Montenegro including Kosovo, Myanmar, Sri Lanka, Alaska, Siera Leone, Eritrea, Nigeria, Kenya, Tanzania, Georgia (The Republic Of) including Abkhazia, Madagascar, Bangladesh, Jordan, Democratic Republic of the Congo, Mozambique, Kimitsu-Aomori range in Japan, any area(s) and/or countries banned and boycotted by the U.N., and any other countries prohibited from calling at by the flag state.

Vessel shall not be sent to a port or zone where there is war or warlike hostilities or to a port or zone where declared "held cover" by the underwriters of the vessel.

- Passing Suez Canal is not allowed

- No direct trade between P.R. China and Taiwan

- Ukraine allowed but if vessel calls Ukraine, Charterers pay all penalty on to vessel for not comply local regulation including ballast water regulation and USD3,000/port as donation to port authority/officer.

- Gulf of Aden is always excluded from trading area.
  The area enclosed by the following boundaries;
  a) on the west, longitude 45°E
  b) on the north, latitude 15°N
  c) on the east, longitude 57°E
  d) on the south, latitude 10°N

- Indian Ocean of following area is always excluded from trading area.
  beyond the eastern Somalia and Gulf of Aden areas out to 78°E,
  south of latitude 15°N with the southern boundary being 12 °S.

- When routing north/south or south/north vessels to navigate east of Madagascar, keeping south of 12°S latitude and east of 78°E longitude.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011



### Clause 30 – War Risk Insurance

Basic war risk insurance premium for world wide trading shall be for Owners account and additional premium for Hull and Machinery and Officers / Crew including blocking and trapping and war crew liability and crew war bonus due to this one time Charter trip as per the governing Charter Party if any, shall be for Charterers account. Insurance/extra insurance not to exceed official quotation by Lloyds Underwriters London. However if such insurance is not obtainable commercially or through a government the vessel shall not be required to enter or remain at any such port or zone. And Owners will have the right to refuse vessel entering into war zone as per Charter Party.

### Clause 31 – Panamz/Suez Canal Transit

The Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate during the currency of this charter to comply with current regulations and requirements of both canals.

### Clause 32 – Boycott

If the vessel is boycotted, picketed, blacklisted or if any similar incident occurs at any port or place by shore and/r port labours and/or tugboats, and/or pilots or by government and/or any authority, by reason of manning or Ownership/Management or terms and conditions on which members of the officers/crew are employed, all consequences and any extra expenses incurred therefrom to be for Owners account and the Charterers are entitled to place the vessel off hire from any time lost by such reasons. Charterers shall not trade the vessel to any port or place where the vessel is known to be boycotted by shore and/or port labours and/or tugboats and/or pilots or by government and/or any authority by reason of the vessel's flag/registry.

### Clause 33 – War Cancellation

If war breaks out between any two or more of the following countries:
United kingdom, U.S.A, Russia, people's Republic of China, Japan, directly affecting the performance of this charter, both the Owners and the Charterers shall have the options of cancelling this charter provided that the trading of the vessel is significantly affected adversely due to the outbreak of war. The Charteres shall redeliver the vessel to the Owners if she has cargo on board after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or is she has no cargo on board, at a port at which she stays or is at sea at a near and safe port as directed by the Charterers. In all cases hire shall be paid until the vessel's redelivery. Both Owners and Charterer shall act in good faith in invoking this Clause.

### Clause 34 – Requisition

Should the vessel be requisitioned by the government of the vessel's flag during the period of the charter, the vessel shall be deemed to be off hire during the period of such requisition and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. In the event for such requisition, the Charterers shall have the option to cancel the balance period of this charter.



**Rider Clauses to M/V "Sanko Royal" / JIT**
**Charter Party Dated 20th October 2011**

### Clause 35 - Deratting Certificate
The vessel shall be delivered with a valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of the charter, costs of renewal of certificate and any required fumigation for obtaining of such certificate, if necessary shall be for the Owners account. Any detention and extra expenses incurred thereby shall be also for the Owners account.

### Clause 36 - Quarantine
Normal quarantine time and expenses for the vessel's entering port shall be for the Charterers account but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, officers and crew shall be for the Owners account.

### Clause 37 - Equipment
The Vessel's equipment shall comply with the regulations and/or requirements in effect at the port or ports of all, canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of a valid and up to date certificate on board to comply with such regulations and/or requirements. If stevedore, longshoremen or other labours are not permitted to work by reason of any failure of the Captain the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up to date certificates, then the Owners shall take immediate corrective measures. The Charterers may suspend hire for time lost thereby and any extra expense including stevedores standby time shall be for Owner's account.

### Clause 38 - Stevedore Damage Clause
Notwithstanding anything contained herein to the contrary the Charterers shall pay for any and all damage to the vessel caused by stevedore provided the Master has notified the Charterers and/or their agents in writing as son as practical but not later then 48 hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(a) In case of any and all damage(s) affecting the vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the vessel is to remain on hire until such repairs are completed and if required passed by the vessel's classification society.
(b) Charterers are to endeavour to repair any and all damage(s) not described under point (a) above at Charterers time and expense before redelivery, but, Owners accept redelivery without Charterers repairing the damage(s) not described under point(a) above and in such a case the Charterers to pay for the costs and time prior to redelivery in order to avoid outstanding between Charterers and Owners.

### Clause 39 - P and I Club
The Owners guarantee that the vessel shall be fully covered by P and I Club. The Charterers have the benefit of the Owners granted by the P and I Club as far as the rules permit.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011

### Clause 40 – N.Y.P.E. Interclub Agreement

Liability for cargo claims shall be borne by the Owners and the Charterers in accordance with NYPE Interclub Agreement as amended September 1996 including subsequent amendments.

### Clause 41 – Agents

Charterers will have their Agents to attend Owners minor/normal husbandry affairs without charging separate agency fees; however should there be any extra ordinary matters such as crew change, dry dock, special survey, major repair, and general average work for Owners account. Owners shall employ Charterers Agents, as Owners husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint their own husbandry agents at their expense.

### Clause 42 – Deductions

Charterers will immediately check if Owners account is incurred or not at each port after redelivery and if not incurred Charterers will pay back those holding amount within 7 running days after redelivery. If any Owners account incurred actually, those vouchers to be collected/dispatched to Owners immediately and to be settled within 30 running days after vessel's redelivery. The Charterers shall be entitled to deduct from last hire payment estimated costs of bunkers on redelivery.

### Clause 43 – Joint On / Off hire Survey

A joint on/off hire bunker and condition survey to be held upon delivery/redelivery to ascertain the vessel's condition and bunker quantity on delivery/redelivery. Such survey is to be done in Charterers time and survey cost is equally shared between Charterers and Owners.

### Clause 44 – Replenishment of Bunkers

Owners to be allowed to replenish bunker before redelivery subject such bunkering does not interfere with Charterers loading/discharging operation.

### Clause 45

A. Liberties

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress and to deviate for the purpose of saving life and property.

B. Off Hire

In the event of loss of time from deficiency and/or default and/or strike of Officers or crew, or deficiency of stores, fires, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest of the vessel (unless such arrest is caused by events for which the Charterers, their servants, agents or subcontractors are responsible), or detention by average accidents to the vessel, or cargo unless resulting from inherent vice, quality or defect of the cargo, dry-docking for the purpose of examination or painting bottom or by any other similar cause preventing the full working of the vessel, the payment of hire and overtime. If any, shall cease for the time thereby lost. Should the vessel deviate or put back during a voyage, contrary to the orders or direction of the Charterers, for any reason other than accident to the cargo or where permitted in Clause 45A hereunder, the hire is to be suspended from the time of her

**Rider Clauses to M/V "Sanko Royal" / JIT**
**Charter Party Dated 20th October 2011**



deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All bunkers used by the vessel while off hire shall be for the Owners account. In the event of the vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars, any detention of the vessel and/or expenses resulting from such detention shall be for Charterers account. If upon the voyage the speed be reduced by defect in or breakdown of, any part of her Hull, Machinery or equipment, the time so lost and the cost of any extra bunkers consequence thereof and all extra proven expenses may be deducted from the hire.

**Clause 46 – Capture, Seizure, Arrest**
Should the vessel be captured or seizured or detained or arrested by any authority or by any legal process during the currency of this Charter Party for any reason attributable to the Owners the payment of hire shall be suspended until the time of her release.

Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners account.

**Clause 47 – Smuggling**
Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners account if caused by the Officers and/or crew, or shall be for Charterers account if caused by the Charterers supercargo and/or their staff or agents.

**Clause 48 – Return Premium**
The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their Underwriters as and when received from the Underwriters by reason of the vessel being in port for a minimum period of 30 days if on full fire for this period or pro rata for the time actually on hire but Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port.

**Clause 49 – Hold Condition on Redelivery**
Charterers are to redeliver the vessel with unclean holds and to pay USD5,000 lumpsum Excluding removal/disposal of dunnage/lashing/plastics which to be for Charterers time/account before redelivery.

New regulation relating wood package including dunnage, 7 CFR Section 319 in U.S.A. to be applied and all time/expense which will be caused by violation of this regulation to be for Charterers account with full responsibility for all consequences incurred thereby.

**Clause 50 – Gangway Watchman**
Expenses for gangway watchmen, if ordered by the vessel to be for the Owners account but if ordered by the Charterers or required by a port regulation except in the case such watchmen are necessitated due to nationality or conduct of any of the ship's members such expenses shall be for the Charterers account.

Crew nationality: Philippine.



Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011

### Clause 51 – Additional Equipment, Fittings
The Charterers, subject to the Owners prior approval not to unreasonably withheld, shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers expenses and time and the Charterers shall remove such equipment and fitting and restore the vessel to her original conditions at their expenses and time prior to redelivery.

### Clause 52 – Loading on Deck
Deleted.

### Clause 53 - Tax
Any dues and/or taxes on vessel's cargo and/or freight and/or charter hire to be for Charterers account. However any taxes on charter hire levied by country of vessel's flag, registry and/or Owners principal place of business to be for Owner's account.

### Clause 54 – Paramount Clause
Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, York Antwerp Rule 1994, U.K. Clause Paramount, wherever applicable shall be deemed to form a part of this Charter Party and shall be contained in Bill of Lading issued hereunder. CONWARTIME 2004 as per under noted, P and I Bunker Clause also form part of this Charter party.

#### CONWARTIME 2004
(a) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.
(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011



## Clause 55 – Communication and Entertainment

Charterers shall pay Owners a lump sum of USD1,300 per month or pro rata payable together with hire for vessel's communication like telephone, cable, telex, victualling and entertainment during charter period.

## Clause 56 – I.T.F. Clause

Vessel's crew shall be covered at all times by an I.T.F. Agreement or Bona Fide trade union Agreement that is acceptable to the I.T.F. or its affiliates. Any cost or loss of time due to Owners failure to comply with the above to be for Owners account.

## Clause 57 – Oil Pollution

Charterers shall bear no responsibility for all consequences (including fines if any imposed to Charterers) of oil and any time lost due to pollution of oil or its consequences shall be deemed off hire.

Vessel possesses a certificate of financial responsibility meeting the requirement of US. Federal Water Pollution Control Act, as amended or any statutory modifications or re-enactment thereof. Owners particularly further warrant that the said certificate of Financial Responsibility will be maintained effective throughout the duration of performance under this charter. Should the vessel be delayed or detained due to failure to comply with aforementioned the charterers shall place the vessel off hire for such time lost.

However notwithstanding the foregoing paragraphs the parties are aware that the Oil Pollution Act of 1990(the "Act") has recently been enacted into law in the United States. Under the provisions of the Act, States of the United States have the right to pass legislation that could impose liability, sanctions or other conditions in addition to those set forth in the Act. The effect on P and I Insurance by the foregoing is uncertain.

In view of the uncertainties, in the event of following cases are applied in futures, Owners shall not be obliged to provide additional premium or similar extra payment to obtain P and I cover, shall be under no obligation to obtain any documents from any other source in case Owners P and I Club restrict the issuance of, revoke or refuse to issue, responsibility, or other similar documents and shall not be obliged to trade to the United States, Charterers and Owners shall mutually discuss in good faith ways and means to resolve the problem:

1. If the Owners P and I Club were to require an additional premium or similar extra payment for providing the Owners and the vessel with P and I cover for potential liability for trading to areas in the United States.
2. If, due to laws or regulations enacted or issued by the United States or by any of the States of the United States the Owners P and I Club refuses or is unable to provide full P and I cover for pollution liability.
3. If the Owners P and I club is restricting the issuance of, revoking or refusing to issue, letters of compliance, letters of undertaking, letters of guarantee certificate of financial responsibility or other similar documents.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011



#### Clause 58

Export and/or import permits for cargo and trade to be at Charterers risk and expense. Taxation or levies in respect of cargo and trade to be for Charterers account and to be paid by Charterers.

#### Clause 59 - Grain Clause
Deleted.

#### Clause 60 - Arbitration

Arbitration in London and Standard BIMCO Dispute Resolution Clause for London Arbitration under English Law including LMAA small Claims to be applied.

#### Clause 61 - Delivery Notice
Deleted.

#### Clause 62 - Hold Condition on Delivery

Vessel's holds on delivery or arrival at first load port to be clean/swept/dry so as to receive Charterers intended cargo in all respects, free of salt, rust scale and previous cargo residue to the independent surveyor's satisfaction. If the vessel fails to pass any hold inspection/test as above, the vessel should be placed off hire from rejection until the vessel passes the same inspection/test again and any time/directly related expenses incurred thereby to be for Owners' account.

#### Clause 63 - Preparation for Loading/Discharging Operation

Before and upon arrival at a port, vessel's officers/crew to shape up vessel's hatches and gangway in order to commence loading/ and/or discharging without any delay but always subject to the vessel's safety, local regulation, weather permitting. Opening/closing of all hatch covers shall be done by Officer/crew, free of cost to Charterers if allowed by shore regulations.

#### Clause 64 - Weather Conditions

Charterers may supply Oceanroutes weather service to the Master during the voyages specified by the Charterers. The Master is to comply with the reporting procedure of the weather service. The vessel shall be capable, at all times during the currency of this Charter Party, of steaming as per vessels particulars. For the purpose of the Charter Party, good weather conditions are to be defined as wind speeds not exceeding Beaufort Force 4 and Douglas Sea State 3. Evidence of weather conditions are to be taken from the vessels deck and log and from weather service reports. In the event of a consistent discrepancy between the deck logs and weather service reports, the weather service reports are to be taken as ruling. In the event of a dispute over an apparent breach of the speed and consumption warranty in this Charter Party, the performance data supplied by Oceanroutes shall be taken as binding on both parties.

It is always understood that the route taken remains at the Master's final discretion. Any performance evaluation is to be carried out on completion of voyage, upon receipt of vessel's logs, and is to be based on the actual miles steamed by the vessel and the vessel's engine performance. No deduction from hire to be made unless agreed in a mutual settlement or an award of arbitration.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011

Vessel may use additional MDO in main engine in bad weather/rough sea, when entering/leaving port and manoeuvring in narrow/shallow/in canals and straits/restricted waters etc.

## Clause 65
Master and crew shall cooperate with the Charterers, Receivers or their representative insofar as local regulations permit to facilitate loading and discharging operations.

## Clause 66 - Certificates
Owners are obliged to deliver the vessel with all necessary and valid certificates - such as (but not limited to ) International Tonnage Certificate, Deratization Certificate, Safety and Health Certificate, Cargo Handling Gear certificates, Safety Equipment Certificate, all Canal Certificates, Class Certificates, Untrimmed Ends Certificates and similar - and all such certificates to be kept in valid condition by Owners throughout the period of the Charter.

## Clause 67 - Australia's Regulation
The vessel to comply with and be maintained in accordance with the requirements of the Commonwealth of Australia's Loading and Unloading Safety Measures Regulations. The vessel to be fitted with hold ladders acceptable for New Zealand and Australian trade.

## Clause 68
Steel products and general cargo to be loaded, dunnaged, stowed, lashed, secured, trimmed and discharged, also dunnage placed on tank top to Master's satisfaction and to be loaded and stowed according to vessel's tank top strength and stability date.

## Clause 69 - Hire Calculation
Time of delivery and redelivery to be based on GMT for purpose of hire calculation but laydays/cancelling dates to be based on local time.

## Clause 70
Vessel has liberty to use diesel oil in main engine on entering/leaving ports or manoeuvring narrow/shallow/restricted water, canal, and rivers or in and out of ports.

## Clause 71 - U.S. Trade Unique Bill of Lading Identifier Clause
The Charterers warrant that each transport document accompany a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier required by the U. S. Customs Regulations (19 CRF Part 4 Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non compliance with the provisions of this Clause shall amount breach of warranty for the consequences of which the Charterers shall be liable and hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and expenses incurred including fines as a result of the Charterers' breach of the provisions of this clause shall be for Charterers' account.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011

## Clause 72
Vessel's constant including unpumpable ballast excluding fresh water is about 370 metric tons but without guarantee.

## Clause 73 - Bunkers on Delivery/Redelivery
Bunkers on delivery: as on board, about IFO 1000 metric tons and about 50 metric tons MDO.

Bunkers on redelivery: Minimum 700 metric tons IFO and about 50 metric tons MDO.

Bunker prices: USD647 per metric ton for IFO and USD813 per metric ton for MDO at both ends.

## Clause 74 - Original Bills of Lading
In the event that the vessel arrives at the port of discharge but original Bill(s) of Lading are not available for presentation, it is agreed that Charterers will request Owners to discharge the cargo on board without presentation of original Bills of Lading provided that Charterers will present to Owners a Letter of Indemnity attached with a copy of the original signed Bill(s) of Lading in the form as required by Owners P and I Club, singed by Charterers. The letter of indemnity shall be sent to Owners with reasonable time allowance.

## Clause 75 - Hire Payment
First hire and value for consumable bunker upto Singapore to be paid upon vessel's delivery. Settlement of bunker on delivery and bunker on redelivery to be done in semi-final payment.

Bank charge on hire payment if any to be for Charterers account.

## Clause 76 - Private and Confidential
All trading and eventual fixture to be kept Private and Confidential.

## Clause 77 - Bunker Quality
Charterers guarantee to supply bunker with quality with the requirement of RMG380 for IFO and DMB for MDO under ISO 8217-E (2005).

Both IFO and MDO arranged by Charterers under this contract to be in accordance with RMG 380 respectively DMB specified in DNV's ISO 8217:2005(E) International standard together compliance with terms in the same publication and Annex VI of Marpol 73/78 Regulation 14 which has come into force from 19th May 2005.

It is understood that the vessel's speed and daily bunker consumption as agreed shall apply for trades in area except emission control zone stated in Marpol 73/78 Annex VI and zones regulated by regional and/or national authorities such as, but not limited to EU and US Environmental Protection Agency in regarding to maximum sulphur content requirement.

If Charterers trade in the emission control zone, Charterers shall supply bunker to meet Marpol Annex VI which bunker during trading in such emission control zone at Charterer risk, time and expense without mixing up with other bunkers on board.



In order for Charterers to comply with appropriate Marpol regulations and/or requirements of the relevant emission control zone, the vessel will have to consume fuels of the required sulphur content will in advance of reaching such zone, as ordered by Charterers.

Master and Owners and Managers consider that such consumption should commence (with full speed navigation not anchoring nor drifting) about 48 hours prior to reaching such zone in order to purge the exhaust of the previous heavy fuel high sulphur fuel content. Therefore to also protect Charterers of the consequences of their indemnity to Owners, Charterers to supply the vessel with sufficient appropriate low sulphur fuel at Charterers risk and expense and Charterers guarantee that the vessel can commence consumption of such Charterers low sulphur fuel (with full speed navigation) about 48 hours prior to reaching such zone and the vessel should be fully on hire during the whole time.

If Charterers will trade to California ports and within 24 nautical miles of the California baseline before entering such a zone, Charterers are to supply MGO (DMA) bunkers which burns for diesel generators during trading.

Passage within California waters at Charterers time/risk/expense without mixing up with other bunker grade(s).

The vessel is to consume MGO (DMA) instead of MDO (DMB) well in advance of reaching such California waters.

Master and Owners and Managers consider that such consumption should commence at least 48-72 hours prior to reaching 24 nautical miles of the California baseline in order to purge the exhaust of the previous MDO (DMB).

## Clause 78 – Bill of Lading Clause

A. The Master shall sign the Bills of Lading for the cargo as presented in conformity with Master's or Tally Clerks Receipt. However, the Charterers may sign Bill(s) of Lading on behalf of the Master with the Owners prior written authority always in conformity with Mate's or Tally Clerks receipts and Charterers holding Owners harmless against all consequences arising out of their signing Bill(s) of Lading.

B. All Bill(s) of Lading shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any Bill(s) of Lading signed by Charterers or by the Master at their request.

## Clause 79 – Extra Insurance

Any extra insurance, blocking and trapping insurance, war risks, crew war risks/bonus, and all such additional premiums, if any, on the vessel are for the Charterers account to be paid by Charterers.  Same not to exceed minimum quoted by Lloyd's of London, Charterers to pay additional premiums against receipt of Underwrites invoices.

**Rider Clauses to M/V "Sanko Royal" / JIT**
**Charter Party Dated 20th October 2011**

## Clause 80 – Pre-loading Survey
In case that Steel/Steel products are to be loaded, Owners have the option to carry out pre-loading survey to be performed by Owners P and I Club's appointed surveyor. Such cost to be for Owners' account.

## Clause 81 – Bottom Fouling Clause
In case of bottom fouling due to Charterers ordering the vessel to stay in port (including outer anchorage) for a minimum period of 35 days, Owners will carry out bottom cleaning (underwater cleaning by divers) at Charterers time and cost prior to vessel sailing out of the port if such facilities are available, otherwise at the next port in which case until such cleaning is done the warranted speed/consumption are not applicable.

## Clause 82 – Admixture Clause
While Charterers have the option to load two or more cargoes in the same hold, Charterers are to supply, erect, dismantle and dispose of any and all separations required, at their risk and expense. Notwithstanding any other provisions in this Charter Party, any claims arising from contamination or admixture to cargo carried in the same hold to be for Charterers account.

## Clause 83 – Ice Clause
- Charterers to guarantee always ice free.
- Vessel not to force ice and not to follow ice breaker under any circumstances.
- Vessel not to be obliged to force ice. If on account of ice, Master considers it dangerous to remain at the loading or discharging port or place for fear of vessel being frozen in, he has the liberty to sail to a convenient, open place and await Charterer's fresh instructions. Unforeseen detention through the above to be for Charterers account.
- Any extra insurance premium incurred by going to Charterers intending ports to be for Charterers account.
- Charterers have full responsibility for all consequences incurred thereby calling ice port(s)(including but not limited to hull damage and expenses of joint hull inspection to ascertain hull condition)

## Clause 84
BIMCO Double Banking Clause to apply.

## Clause 85
CONWARTIME 2004 to apply.

## Clause 86
BIMCO ISM Clause to be applied.

## Clause 87
Bimco ISPS/MTSA Clause for Time Charter Parties 2005 to be applied.

## Clause 88
BIMCO Bunker Fuel including Sulphur Content Clause for Time Charter Parties 2005 to be applied.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011



**Clause 89**
All pilotage to be paid by Charterers.

**Clause 90**
Owners confirm that vessel can load intended cargo upto full deadweight capacity provided vessel's tank flat top strength/stability permitted and Master's satisfaction which not to be unreasonably withheld.

**Clause 91 Marpol Annex VI to be applied as follows**
**Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 92**
York Antwerp Rule 1994 to be applied.

**Clause 93**
Deleted.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011



### Clause 94

The vessel shall be delivered and redelivered free of all dunnage, lining and packing materials, including but not limited to lashing/plastics etc used for cargo care.

During the currency of this Charter Party the Charterers shall provide dunnage, lining and packing materials, including but not limited to lashing/plastics etc used for cargo care, as required at their expense.

The Charterers shall ensure that all dunnage and cargo care materials, used shall comply with applicable phytosanitary regulations.

Throughout the currency of the Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of dunnage, lining and packing materials, including but not limited to lashing/plastics etc used for cargo care, in accordance with Marpol 73/78 Annex V or any other applicable rules relating to the disposal of such materials.

### Clause 95 – Fumigation Clause

Charterers have option to carry out fumigation on board a/o en route at their own time, risk and expenses. Vessels and her appliances as on board if any, are fitted a/o suitable in all respect for fumigation on board a/o en route.

All fumigation costs including reasonable crew meals, transportation and accommodation onshore to be for charts acct, if the crew is required by the fumigation officer(s) and/or port authority to leave the vessel during fumigation. Expenses for fumigation to be for Charterers account including chemicals, equipment and protective clothing, which to be provided and paid for by the Charterers/shippers.

### Clause 96

BIMCO Piracy Clause to be applied.

\*\*\*



## BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

*Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.*

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of the Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

> "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Rider Clauses to M/V "Sanko Royal" / JIT
Charter Party Dated 20th October 2011



### BIMCO ISM CODE CLAUSE
From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel thereafter during the currency of this Charter Party . The Owners shall procure that both the vessel and the 'Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damages, expenses or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owners' account.

### BIMCO US Customs Advance Notification/AMS Clause for Time Charter Parties
(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:
i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterersi‾ failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

### BIMCO Piracy Clause for Time Charter Parties
(a) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to any actual, threatened or reported acts of piracy, whether such risk of piracy existed at the time of entering into this charter party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.
(b) If the Owners do not give their consent they shall immediately inform the Charterers and the Charterers shall be obliged to issue alternative voyage orders and any time lost due to compliance with such orders shall not be considered off-hire. The Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

Rider Clauses to M/V "Senko Royal" / JIT
Charter Party Dated 20th October 2011

(c) If the Owners consent or if the Vessel proceeds to or through an area exposed to risk of piracy the Owners shall have the liberty:

(i) to take reasonable preventive measures to protect the vessel, her crew and cargo including but not limited to taking a reasonable alternative route, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel,
(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;
(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions,
(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(d) Costs

(i) If the Vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional insurance, additional personnel and preventative measures to avoid piracy attacks, such costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;
(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first;
(iii) If the underwriters of the Owners' insurances should require payment of additional premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of piracy risks, then the actual additional premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Vessel is attacked or seized by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire. If the Vessel is seized the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

*** End ***

# Exhibit 2

*"SANKO ROYAL"*

# Richards Hogg Lindley

### Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM
(Dated 12 September 2014 )

**VESSEL:**      **"SANKO ROYAL"**
(Bulk carrier built 1995 gross tonnage 25,676)

**VOYAGE:**      China to Angola with a general cargo of mixed building products, steel coils and project building cargo including second hand decommissioned containers.

**CASUALTY:**      08 December 2011: Diverting to Mauritius due to cargo stowage collapse in heavy weather.

**INSURANCES:**      US$ 15,000,000 insured 1200 hrs 10th July 2011 – 1200 hrs 10th July 2012. Subject to Institute Time Clauses Hulls 1.10.83 including Additional Perils Clauses Hulls 1.10.83 subject to policy deductible Yen 50,000,000. Small General Average clause Yen 30,000,000. Subject to Institute Warranties (1/7/76) and Bearing Sea Transit Clauses and hull classification clauses.

**SUMMARY:**      The vessel loaded cargo at Tianjin and experienced heavy weather on passage to Shanghai where cargo was restowed and more cargo loaded. After calling at Singapore for bunkers she met with very heavy weather in the Indian ocean and the cargo stack in hold no.5 became unsecured. She diverted to Mauritius where the no.4 and 5 cargo holds were inspected. The no.5 hold tank top was punctured with fuel and ballast water in the hold there are also some damages found in No. 4 hold. All containers in holds 3,4,5 and 6 were discharged and the general cargo in all holds and steel coils in hold 4 were discharged/shifted within the vessel. The damage to hold no. 5 was temporarily repaired. Stowage fittings were installed and the cargo was reloaded. She proceeded to destination and discharged cargo. The vessel was subsequently sold without permanent repairs being effected.

**ADJUSTMENT SUMMARY:**      Adjustment of General Average in accordance with York Antwerp Rules 1994.

**CLAIM:**

| | |
|---|---:|
| Amount due to shipowners | US$ 1,004,617.83 |
| Amount due to adjusters | 112,030.00 |
| | US$ 1,116,647.83 |
| | |
| Payable by: | |
| Cargo interests | US$ 1,110,843.06 |
| Bunker interests | 5,804.76 |
| | US$ 1,116,647.83 |

**A.L.O'Neill**
**Fellow of the Association of Average Adjusters**
**Assistant Director**

Unless otherwise agreed in writing, the matter is accepted subject to our Standard Terms of Business, which are available at (http://www.ctplc.com/adjusting). If you would like us to forward to you a copy of these, then please let us know. Our liability in connection with this matter is limited to the lesser of £1m or ten times the value of our fees or such other amount as has been agreed in writing.

Richards Hogg Lindley is a trading name of Charles Taylor Adjusting Limited
Registered office: Standard House, 12-13 Essex Street, WC2R 3AA. Registered in England No.1994696

**Richards Hogg Lindley**
4th Floor, Royal Liver Building,
Pier Head, Liverpool
L3 1JH

T: +44 151 227 2175
F: +44 151 227 2179
E: info-liverpool@rhl-ct.com
www.rhlg.com

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## <u>ADJUSTMENT OF CLAIM</u>

### CONTENTS

1) SUMMARY OF FACTS ........................................................................................... 1
2) GENERAL AVERAGE .......................................................................................... 6
3) RECOVERY PROSEPECTS ............................................................................... 11
4) PAYMENT OF ACCOUNTS ................................................................................ 11
5) APPENDICES ..................................................................................................... 11
6) SUMMARY OF DISBURSMENTS ...................................................................... 12
7) APPORTIONMENT OF GENERAL AVERAGE ................................................. 13
8) FINANCIAL BALANCE ....................................................................................... 14

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

### 1) SUMMARY OF FACTS

The vessel was on a voyage from China to Angola with a general cargo of mixed building products and equipment including steel coils, bagged cement/gypsum and other materials including one large consignment of project building cargo including second hand decommissioned re-rated containers.

The vessel had arrived at Tianjin on 26 October 2011 and loaded general cargo under 47 bills of lading into holds 2, 4, 5, 6, 7 & 8, with all 141 containers loaded into holds 4 & 5. On 04 November she left for Shanghai, she encountered heavy weather on passage which caused cargo to shift in some holds, particularly in hold no. 5.

On 08 November the vessel anchored at Shanghai Chiang Jiang Kou anchorage but she continued rolling at 5 degrees resulting in further cargo shifting and impact on the coaming and the master decided to raise anchor and proceed at slow speed to berth.

On 11 November the vessel berthed at Shanghai and the original container lashings in holds number 4 and 5 were found to have given way and the stacks had shifted due to displacement of the wooden chocks, one container had also collapsed under the weight of the overstowed boxes and some containers in the 6th tiers in the hatch coamings were deformed as a result of contact with the coamings. This container was removed and the upper tier boxes were restowed in no.6 hold. The damaged box was unstuffed on the quay and the content reportedly stowed in no.2 cargo hold.

The containerised cargo from both ports was resecured in holds 3, 4, 5 and 6 with H beam girders used to form chocks between the side containers and the hold sides. Additional chocks were welded to the tank top and bridge pieces and bottle screws used to secure the top of the stow. A further 136 containers were also loaded at Shanghai.

On 17 November the vessel sailed for Singapore for bunkering which was performed on 26 November. During the voyage from Shanghai to Singapore the vessel encountered further heavy weather and during the daily inspections it was noticed some lashings were beginning to part; these were re-lashed in attempts to secure the cargo during the bunkering operations, after which the vessel departed for Luanda.

During the passage through the Indian Ocean the vessel rolled severely in storm force conditions and the cargo in no.5 hold began to shift and move, slamming into the coamings, destroying the H beam chocking and breaking the lashings. On 02 December the Master decided to reduce the speed to mitigate the rolling of the vessel in the 2-3 metre swells. The bad weather continued and the unsecured cargo stack in hold 5 continued to move within the hold. The Master decided to divert to Mauritius as a port of refuge for the common safety of ship and cargo. On 08 December the vessel arrived and waited to berth.

On 9 December an initial inspection of the cargo within hold no. 5 was made which found four of the bottom containers on port side to be badly collapsed, 2 on the second tier partly collapsed and one on the sixth tier badly deformed. The dunnage was no longer in place and the lashings mostly broken. Fuel was also observed on the tank top. An initial inspection of no. 4 hold was also performed and found the steel wire stow had collapsed and was leaning towards the containers, the containers had moved back touching the hatch coaming, the dunnage and lashings visible appeared in place and the vessel condition could not be determined until the hatch covers could be fully opened.

## ADJUSTMENT OF CLAIM

The no.3 port and starboard wing ballast tanks were inspected and the port side tank was found to be contaminated with fuel oil (the no.3 port and starboard wing ballast tanks extended over the full length of cargo holds 5 & 6 with the no. 2 centre double bottom tank located between them).

At 1924hrs on 11 December she berthed at Quay A.

On 12 December the vessel's hatch covers were opened to inspect the top of the cargo stows, a summary of the findings as follows:

*Hold no.1: two bagged cargo collapsed and leaning to other cargo, two bags torn and spilled out. Dunnage in place, lashings loosened for retightening, securing material in place. No damage to vessel seen.*

*Hold no. 2: steel products leaning towards forward bulk head, some dunnage displaced, lashing loosened for retightening, some wire lashings parted, scratches on the hatch walls due to displaced dunnage.*

*Hold no. 3: container cargo in original stowed position, no sign of deformation, dunnage between containers collapsed in places, some lashings parted, securing materials broken, one of the vessels hatch lamp deformed.*

*Hold no. 4: containers in original stowed condition, some leaning/spilling, dunnage firmly compressed in places, container feet/post touching the tank top, some lashings parted, no damage to the vessel seen on visible areas.*

*Hold no.5: 4 containers badly deformed, 4 badly collapsed, 2 partly collapsed and leaking from a further container, dunnage was out of place, lashings were parted, the vessel had signs of indentation to the aft coaming port side, the tank top damage could not be determined as covered with bunker fuel and containers would need to be offloaded to assess further damages.*

*Hold no.6: two containers slightly deformed, one showing signs of leaking. Some dunnage missing, lashings broken, no damage to the vessel seen.*

*Hold no. 7: cargo leaning, dunnage displaced in parts, lashing loosened for retightening, no damage to the vessel seen.*

*Hold no. 8: cargo in place, some dunnage displaced, lashing loosened, securing materials in place, no damage to the vessel seen.*

As mentioned the most significant damage was observed to no.5 hold and the presence of bunker fuel indicated the no.2 centre double bottom fuel tank had been breached and fuel oil/ballast water was in the bottom of the hold. Some of the containers were also leaking liquid cargoes.

On 13 December cargo holds 3, 4, 5 and 6 were opened again for inspection of the container lashings, twistlocks and dunnage under the corner castings. The container numbers were also noted so that accurate bay plans could be drawn up.

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

Discussions subsequently ensued with the owners, port authority, cargo handling company, local shipyard and cleaning company regarding the steps necessary to access the tanktops for inspection/repair and the removal of oil and water residues from fuel tanks, ballast tanks and cargo holds.

The no.3 port wing ballast tank was pumped to below the tank top level and some of the water contaminated fuel from no.2 centre double bottom fuel tank was transferred to no. 3 centre double fuel tank in order to drop the level within no. 5 cargo hold. The plan then involved:

> *Discharging the container cargo from holds 3, 4, 5 & 6 to the quay.*

> *Discharging the damaged containers from the lower and 2nd tier of no. 5 hold after cleaning within the holds.*

> *De-vanning of collapsed containers and availability of replacement containers for restuffing of contents salved.*

> *Reloading of all containers to minimise stack weights and provide greater access for securing.*

> *Use of approved bottom stacking cones and container lashing equipment.*

The clean up operation proposed involved two phases:-

> *Fflg procedures discussed for the cleaning of Hold No.5 tanktop/bottom containers/its cargo contents/parted lashing materials:*

- *Using HP water blaster / diesel oil/carting away the washing water by lorries.*

- *Fabricate steel stands to level up the containers in order to clean the bottom side of the containers.*

> *Fflg procedures discussed in emptying of FOT 2C (confirmed possible) & FOT 3C (to be confirmed the availability of shore storage by tmrw/16th):*

- *Emptying the FOT using lorries for transport to shore facility, takes about 10 trips for each tank.*

- *Gas freeing using shore procedures/equipment.*

- *The tank will be washed with HP pump using MGO (cheaper if supplied by vessel rather than local supply, to use about 3mt.*

- *After washing with MGO, it will be washed again with HP hot water twice and sludge will be landed ashore.*

- *The tank will be dried up with dry hot air using shore equipment.*

## ADJUSTMENT OF CLAIM

At 1248 hrs on 16 December 2011 the vessel shifted from the berth back to the anchorage where she awaited availability of berth and quay space for cargo discharge, repairs and restowage.

On 28 December the vessel shifted to berth for cargo discharge which commenced at 07.30hrs on 29 December. Cargo from holds 3, 4, 5 and 6 were discharged and operations were monitored by Marine and General Surveillance who noted the seal numbers and general external condition.

By 2330 hrs on 30 December hold no.3 was empty and hold no.5 only had the damaged bottom tier (10 containers) and one from the 2nd tier remaining. 85 containers remained in holds 4 and 6 which would be discharged after the holiday period.

On 31 December Eco Fuel Ltd, who were appointed to clean up the no.5 hold ballast and fuel tanks, began mobilising their equipment. 02 January 2012 they began cleaning around the lower tier containers in hold no. 5.

03 January the remaining accessible containers were discharged.

A total of 261 containers were discharged from holds 3, 4, 5 and 6. 11 containers remained onboard. These containers were contaminated with a mixture of fuel oil which had leaked out of the no.2 double bottom fuel tank and ballast water from no.3 port wing tank and also residues of cargo leakage from within several containers. The port authority would not allow these containers to be landed on the quay before cleaning and therefore cleaning had to be effected onboard, within the no.5 hold or using the adjacent no.6 cargo hold.

7 of the 11 containers were cleaned over the following days which involved lifting, cleaning underneath and transferring to hold no.6.

The fuel oil/cargo contaminants had also accessed the no.3 port wing ballast tank and the no.3 centre double bottom fuel tank that had been emptied of fuel and then used to hold the ballast water contaminated fuel from no.2 centre, which was transferred using the ships fuel oil transfer pump to reduce the level in the cargo hold. The cleaners discharged the contaminated water from no.3 port wing ballast tank to road tankers in preparation for cleaning the tanks for hot work when the last containers were removed and the tank top became ready for temporary repairs.

On 04 January, Taylor Smith and Co, the local shipyard who were contracted to effect removal of damaged lashing materials, sea fastenings and distorted "tomming" channels, began work. Taylor Smith and Co were also contracted to perform temporary repairs to the no.5 tank top and to install bottom stacking cones for the restowed containers and D rings for the LOC revised lashing plan.

On 05 January the cleaning team commenced pumping ashore the contaminated ballast water from tank no. 3P. By 06 January 4 crushed containers remained in hold no.5.

Upon inspection the tank top in no.5 hold was found to be heavily set and down at the location of the corner castings at both the forward and aft ends of the hold and on the port side aft the tank top was holed approximately 2.5m from the aft bulkhead and 1.1m from the port inner bulkhead; the plate was locally set down and torn over about 30cm. The tank top was also heavily set down and holed between slots 04 and 06 approximately 2.5m from aft



**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

and 8.5m from the port inner bulkhead. The plate was torn in a star shape over an area of 80cm x 40cm.

A joint survey was also performed in hold no.4 after discovering cracks in the tank top of water ballast tank 2P. 2 fissures were identified on the tank top of hold no. 4 (above the WBT #2).

At 22.00 hrs on 07 January the vessel was shifted to lay by berth as the working berth was required by another vessel and at 23.20 hrs the vessel was alongside the oil terminal jetty.

On 08 January the cleaning gang continued pumping ashore the contaminated ballast water and she was moved back alongside the lay by berth on the 09 January where the pumping continued.

Again on the 10 January the vessel was ordered to vacate the berth and proceed to anchorage. She remained at anchor between the 11-13 January and at 08.40 hrs on 13 January she berthed at quay no. 2 and resumed pumping the contaminated ballast water ashore. The same day pumping ashore contaminated fuel from no.2 F/O tank commenced. During this time the shipyard continued with preparations for welding the container cones and lashing points for back loading the cargo.

Cleaning contractors commenced clearing the contents of 4 crushed containers in hold. no.5 (content of which was already noted to be a total loss by the General Interest surveyor) in order for the shells to be removed from the hold.

On 13 January reloading of cargo commenced, with cargo being reloaded onto the lowest tier in no.3 hold.

On the same day the hull surveyor attended for the repair of the cracked tank top plate in the number 4 hold and later on a welding gang of 8 persons from Taylor Smith completed the welding repair which was checked afterwards.

The final two crushed containers were discharged on 16 January at which time 272 containers had been discharged with the General Interest surveyor noting 79 being visibly damaged.

On 17 January the cleaning contractors continued to clearing the container debris from the hold no.5 and disposal of the cargo. On 18 January the tank top was cleaned and tank cleaning of the no. 2 F/O tank also commenced.

On 20 January a joint survey was held and the tank top and damages were found to be sufficiently clean to allow hot works.

From 20 January the cleaners spent 7 days pumping the water out of the two centre fuel tanks and cleaning the no.5 port wing ballast tank as far as practicable.

On the same day a classification surveyor attended onboard and inspected the damages to the no.5 hold as well as the no.4 hold and no.2 centre double bottom fuel tank and no.3 port wing ballast tank.

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

# ADJUSTMENT OF CLAIM

Over 21-22 January temporary repairs were effected in the no.5 hold by fitting doubler plates over the holed areas in way of the fuel oil tank no.2 and ballast tank no. 3 P, these were approved by the attending class surveyor.

At 1930hrs on 3 February the vessel was fully loaded. On 06 February the vessel departed Port Louis and on 21 February she arrived at destination. Cargo discharge was completed on 05 April 2012. The vessel was subsequently sold without permanent repairs being effected.

## 2) GENERAL AVERAGE

### a) Contract of affreightment

The time charter party dated 20th October 2009 between owners and charterers JIT International provides:

> "General average shall be adjusted, according to York Antwerp Rules 1994 and any amendments thereto in London.
>
> Charterers shall procure that all bills of lading issued during the currency of the Charter will contain a provision to the effect that general average shall be adjusted according to York Antwerp rules 1994 or any amendments thereto."

The cargo was shipped under "Congenbill 1994" bills of lading.

The adjustment has been drawn up in accordance with York Antwerp rules 1994.

### b) Peril

During the voyage from China to Angola the vessel encountered heavy weather in the Indian Ocean and the cargo stowage in the no.5 hold collapsed, containers became unsecured causing damage to the vessel and the vessel deviated to Port Louis, Mauritius as a port of refuge for the common safety. Once in port she was required to remove cargo from no. 4 and no.5 hold to effect temporary repairs to the no. 5 tank necessary for the safe prosecution of the voyage.

### c) Principle allowances in general average

- Deviation to the port of refuge
  Cost of entering and leaving port of refuge (York Antwerp Rule X).

- Port charges
  Port charges incurred during the detention at the port for repairs necessary for the safe prosecution of the voyage (York Antwerp Rule XI).

- Discharging/storing/reloading cargo from no.4 and no. 5 hold
  Costs of discharging/storing and reloading cargo (including extra stowage fittings necessary for reloading) from hold no 4, and from no.5 to enable repairs necessary for the safe prosecution of the voyage (York Antwerp Rule X (b)). See headings i) and j) below.

6

**Richards Hogg Lindley**
*Average Adjusters and Marine Claims Consultants*

## ADJUSTMENT OF CLAIM

- Cleaning hold no. 5
  Costs of cleaning to enable containers to be discharged from the vessel and landed and to allow repairs necessary for the safe prosecution of the voyage to be effected (York Antwerp Rule X, York Antwerp Rule C).

- Temporary repairs to the vessel
  Costs of temporary repairs to the no.5 tank top (York Antwerp Rule XIV).

- Wages and maintenance
  Costs of wages and maintenance of the crew during the prolongation of the voyage as a result of the ship entering the port of refuge, and during the extra period of detention there until the ship was made ready to proceed on the voyage (York Antwerp Rule XI).

- Fuel and stores
  Costs of fuel and stores consumed during the prolongation of the voyage as a result of the ship entering the port of refuge, and during the extra period of detention (for ships ordinary purposes and not including that consumed in effecting repairs) (York Antwerp Rule XI).

- Sundry allowances
  Commission and interest (York Antwerp Rule XX, York Antwerp Rule XXI), Adjusters' fees and expenses, General Interest surveyor fees etc.

**d)  Damage to ship**

The no.5 hold tank top was heavily set down and holed in places and the no.4 hold tank top was hairline cracked where the corner castings had sat.

While the vessel was at the port of refuge she was also involved in a collision with another vessel and sustained some damages as a result.

**e)  Damage to cargo**

As a result of the casualty and collapse of the cargo stow various damages were sustained by the cargo which have been taken into account when assessing the cargo's contributory value below.

**f)  Contributory value of ship**

The contributory value of the ship is based upon her sound market value as advised by N. Shipley and Co at US$ 9,500,000. Less the cost of damage repairs plus any amounts made good in General Average. The estimate for dry docking and repairs was US$ 77,709.40, with an additional US$ 5,000.00 for tank cleaning.   There was no made good in general average.

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

### g) Contributory value of cargo

Cargo was sold on CIF basis and the front of the bill of lading notes freight prepaid therefore cargo contributes on its CIF basis.

The value of the cargo onboard at the time of the casualty, ascertained from the commercial invoices, is <u>US$ 35,210,461</u>. From this the damage loss of <u>US$ 1,396,786</u> must be deducted giving a cargo contributory value of <u>US$ 33,813,675</u>. There was no made good in general average.

### h) Time Charterer's bunkers

Bunkers which were onboard at the time of the general average and remain onboard at destination contribute to general average on their value at the time and place where the adventure ends, plus any amounts made good in general average.

Upon termination of the voyage at 16.42 on 05 April 2012 at Angola the vessel had onboard 80.40MT fuel oil (US$ 740) and 45.63MT diesel oil (US$ 1,050). We are advised no further bunkers were taken onboard between the time of the casualty and arrival at destination.

Given the above the value of the bunkers is <u>US$ 107,408.00</u>. The amount to be added back as made good in general average is <u>US$ 69,287.40</u> as such the contributory value of the bunkers is <u>US$ 176,695</u>.

### i) Discharging cargo and restowage

The York Antwerp rules provide that the cost of discharging cargo at a port of refuge can be allowed as general average when the handling/ discharging was necessary for the common safety, or to enable repairs necessary for the safe prosecution of the voyage (YAR X (b)).

York Antwerp rule X (b) states that the cost of handling on board or discharging cargo, fuel or stores shall not be admissible as general average when incurred solely for the purpose of re-stowage due to shifting during the voyage, unless such restowage is necessary for the common safety.

The rule goes on to provide that when the cost of discharging cargo is allowed as general average the cost of storage and reloading/stowing cargo is also allowed (YAR X (c)).

At the time of the casualty the vessel had containers in holds 3,4,5 and 6 and break bulk cargo in all holds. All of the container cargo was discharged from the vessel at the port of refuge and in view of the above provisions it is necessary to consider the facts behind such discharge to establish what allowances can be made in general average.

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

- Hold no. 5
  As noted above, the vessel was damaged in way of no.5 hold tank top and had breached her fuel oil and ballast tanks which were open to the cargo hold. Given this, temporary repairs were effected to the holed tank tops which were necessary for the safe prosecution of the voyage.

  The General Interest surveyor confirmed in his report the initial inspection at anchorage revealed damage to the no.5 cargo hold tank top and this hold contained 60 x 40ft containers which all had to be discharged to effect repairs. In addition the bottom tier of 10 containers were contaminated with fuel from the ships tanks and had to be cleaned before they could be landed ashore.

- Hold no. 4
  2 hairline cracks were also discovered on the tank top of hold no.4 and temporary repairs were necessary to recover the watertight integrity of the tank top. Given this the costs of discharge were not solely for the purpose of restowage due to shifting.

- Holds 3 & 6
  The other remaining holds were discharged solely for restowage purposes as cargo had shifted due to the bad weather. Once the vessel was in the port of refuge she was no longer endangered by the fact these cargoes had shifted and in accordance with the rule these costs are not allowed in general average.

Given the above we have made an allowance for discharging cargo/storing and reloading cargo from hold no.5 and hold no.4.

### j) Extra restowage fittings

As mentioned in the General Interest surveyor's report, in addition to the temporary repairs in hold no.5 the shipyard were asked to perform several tasks:

1) To burn off all the damaged lashing points and H girders used in original stow.

2) Install bottom locating cones in each of the four holds.

3) Install 'D' rings for lashing in each of the four holds.

4) Install two doubler plates over the holes in the no.5 hold tank top.

5) Install steel plates on six of the hatch covers to locate the container corner castings.

6) Install 'D' rings on each of the six hatch covers.

7) Install 'H' girder stopper rails in each of the four holds.

8) Install side chocks on each of the six hatch covers.

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

9) Install 'D' rings around and on top of No.8 hatch to secure tractors and rollers.

The temporary repair costs are dealt with below. The remaining items are considered costs of restowage, necessary to enable reloading into the holds, and we consider that these costs follow the cost of discharging cargo and have allowed in general average the proportion in connection with reloading cargo into holds 4 and 5.

### k) Replacement containers

We understand 10 containers were required to replace damaged containers unsuitable for reloading. A further 2 x 40ft and 1x 20 ft were needed to carry the displaced steel coils which were previously being carried as bulk break. The devanning and restuffing costs, along with the costs of the containers themselves do not form part of the general average and are associated with the collapse of the stowage.

### l) Restowage / cargo operations

With regard to the cost of restowage of cargo into the remaining other holds (excluding holds no4 and no,5), as noted above, these costs are disallowed in general average and are shown to a separate column.

### m) Temporary repairs

The no.5 hold tank top was holed and fuel/ballast water was entering the hold as a result. It was therefore necessary to effect temporary repairs at the port of refuge in order to safely prosecute the voyage. It was also necessary to repair cracks in tank top number 4 to recover the watertight integrity of the tank top.

The cost of the temporary repairs includes the costs of cleaning the tank top, tank cleaning and removing contaminated ballast water/fuel and hot works permits, classification survey and owners superintendent.

With regard to the clean up costs, after consulting the General Interest surveyor we understand that the clean-up was performed in various stages which involved some of the cleaning being carried out before the tanks were filled with water to prevent an explosion. The temporary repairs were then carried out, after which the water was pumped out/tanks cleaned.

All of the cleaning operations would have been deemed necessary for temporary repairs had all operations been performed before effecting such temporary repairs. This is confirmed by the General Interest surveyor in his letter dated 11 April 2013:-

"Clean Up Costs
As discussed, the cleaning of the tanks was necessary for the execution of temporary repairs.

Emptying of FOT 2 was necessary to allow hot work for temporary repairs.

10

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

Cleaning FOT 2 was necessary to allow hot work for temporary repairs and only performed on a small area.

Cleaning FOT 3, this was empty before the contaminated FOT 2 was transferred and was only pumped out.

The fuel contamination of No. 3 port ballast tank was in the bays directly underneath the hole in the tank top and had to be cleaned to allow hot work for the temporary repair.

The use of the word "treatment" is misleading, all the washing water, ballast water and fuel oil was admixed and had to be "disposed" of ashore.

The cleaners cleaned No. 5 Hold as far as practicable, Para 5.14 of my report is a typo, it should be No. 3 port wing ballast tank."

Given this, we have allowed the cost of cleaning operations in full as part of the costs of temporary repairs.

The General Interest surveyor has further advised that after discharging the containers from hold no.6, 3 tractors were removed to allow the hold to be used for cleaning of containers from no.5 hold. The containers from hold no. 5 had to be cleaned before they could be discharged ashore as a port requirement. Given this we consider the cost of removing the tractors follows the cost of cargo discharge and as such is allowed as general average. The actual cost of cleaning the containers is also allowable as general average.

n)  **General Interest surveyor**

Mr. Ron Orritt from Taylor Marine TR Little attended at Port Louis as a General Interest surveyor on behalf of all parties involved in the general average.

3)  **RECOVERY PROSEPECTS**

We are advised there are no prospects of recovery action against any other parties but if there are then these shall be dealt with separately and outside of this adjustment.

4)  **PAYMENT OF ACCOUNTS**

Owners have provided us with confirmation and dates of payments for all accounts detailed in the disbursements section of this adjustment.

5)  **APPENDICES**

a) Reports and correspondence
b) Detailed disbursements

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

## ADJUSTMENT OF CLAIM

(Please note for reasons of economy, due to their volume, we have not copied herein all of the accounts which are detailed in the disbursements section of this adjustment, however we are able to provide copies if requested).

6) <u>**SUMMARY OF DISBURSMENTS**</u>

| | General Average |
|---|---:|
| | US$ |
| • Port charges at Mauritius | 261,350.26 |
| • Costs in connection with discharging cargo and cleaning of hold no. 5 to enable repairs | 284,569.12 |
| • Temporary repairs and lashing works | 76,953.29 |
| • Costs in connection with lashings for reloading cargo | 50,002.16 |
| • Classification society fees and expenses | 3,210.00 |
| • General interest surveyor fees and expenses | 100,861.69 |
| • Superintendent's fees and expenses | 12,415.79 |
| • F.W. De Groot. Fees and expenses in connection with supervision of repairs and restowage | 27,967.11 |
| • Allowance in respect of fuel and stores consumed during the general average deviation and detention | 69,287.40 |
| • Wages and maintenance of the crew during the general average deviation and detention | 110,461.13 |
| • Adjuster's fees and expenses | 198,750.00 |
| • Commission and interest and allowance for shipowners' incidental expenses | 230,195.65 |
| | US$ 1,426,023.60 |

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

# ADJUSTMENT OF CLAIM

### 7)  APPORTIONMENT OF GENERAL AVERAGE

|  | US$ |  | US$ |
|---|---|---|---|
| **SHIP**<br>Contributory value, as calculated above | 9,417,291 | pays | 309,375.78 |
| **CARGO**<br>Contributory value, as calculated above | 33,813,675 | pays | 1,110,843.06 |
| **BUNKERS**<br>Contributory value, as calculated above | 176,695 | pays | 5,804.76 |
|  | US$<br>43,407,661 |  | US$<br>1,426,023.60 |

The General Average is equivalent to 0.0328518880% of the contributory values.

**Richards Hogg Lindley**
Average Adjusters and Marine Claims Consultants

# ADJUSTMENT OF CLAIM

### 8) FINANCIAL BALANCE

| | US$ |
|---|---|
| **SHIPOWNERS' TO RECEIVE** | |
| Total disbursements | 1,961,392.08 |

| | US$ | |
|---|---|---|
| less: | | |
| Items in the remainder column | 191,882.52 | |
| Restowage / cargo ops costs | 343,485.96 | |
| Amount in respect of ship interests | 309,375.78 | |
| Adjuster's final fee and expenses (unpaid) | 112,030.00 | |
| | | 956,774.25 |
| | | US$ 1,004,617.83 |

| | | |
|---|---|---|
| **ADJUSTERS' TO RECEIVE** | | |
| Their unpaid fee and expenses | | 112,030.00 |
| | | US$ 1,116,647.83 |

| | US$ |
|---|---|
| **PAYABLE BY** | |
| Cargo interests | 1,110,843.06 |
| Bunker interests | 5,804.76 |
| | US$ 1,116,647.83 |

(As mentioned above, the proportion of general average payable by ship interests is borne by owners themselves as the amount is unrecoverable from Hull and Machinery Underwriters given that the amount does not exceed the applicable policy deductible).

### RICHARDS HOGG LINDLEY





Royal Liver Building,
Pier Head,
**Liverpool Waterfront**
Liverpool L3 1JH

**12 September 2014**

A.L.O'Neill
**Fellow of the Association of Average Adjusters**
**Assistant Director**